I .YELVERTON, J.
Brenda and Earl Fusiler appeal a summary judgment which dismissed their medical malpractice claim against the Louisiana Patient’s Compensation Fund (PCF). For the following reasons, we affirm.
FACTS
The Fusilers sued Dr. Robert Rivet, a neurosurgeon, for medical malpractice. Dr. Rivet first saw Brenda Fusiler on May 13, 1991, on referral from Dr. Olga Arter. She complained of neck and mid thoracic pain along with discomfort in her left hand. A myelogram and CT scan revealed multilevel disk disease, with the most significant defects located at C6-7 and C7-T1. The diagnosis was multi-level cervical spondy-losis with nerve root pressure at C6-7 and C7-T1 on the left side. After Dr. Rivet consulted with Dr. Robert Martinez, a neurologist, both doctors agreed that surgery was necessary. Using a posterior approach, Dr. Rivet performed a decompres-sive laminectomy at C4, 5, 6, 7, and T1 with foraminotomies at C5-6, C6-7, and C7-T1 on May 28, 1991. Dr. Robert Franklin, a physical medicine rehabilitation doctor, was consulted to help with Mrs. Fusiler’s postoperative spasm. She was discharged on June 4 with arrangements for her to see Dr. Martinez in four to six weeks for a follow-up visit.
However, Mrs. Fusiler was readmitted to the hospital the next day complaining of severe pain and vibrations all over her body. She also complained of numbness in her left arm and both legs. At this time, Dr. William Cloyd, a neuropsychiatrist, was consulted to help Mrs. Fusiler with pain management. After monitoring Mrs. Fusiler for several days, Dr. Rivet discharged her on June 10. Follow-up visits were scheduled with Drs. Rivet, Martinez, and Cloyd.
12Mrs. Fusiler called Dr. Martinez’s office on June 21 complaining of numbness from her waist down. She had not called any of the other doctors. Mrs. Fusiler saw Dr. Rivet on July 1. She complained of left-sided numbness. She no longer had any pain and was feeling great. On July 25, Mrs. Fusiler called Dr. Rivet’s office asking if it was okay if she increased her activities and was told that she could get out of the house more.
Mrs. Fusiler failed to show for her scheduled appointment with Dr. Martinez on July 24, so she was rescheduled for July 80. She was still experiencing the numbness and now had a shocking sensation in her left arm and leg with pressure at the back of the neck. At that visit Dr. Martinez noted that Mrs. Fusiler walked “with a broad based unsteady gait that is not characteristic of anything in particular. It seemed to be almost functional.”
*1033 Mrs. Fusiler’s next appointment was with Dr. Rivet on August 19. At that time she did not have the severe arm pain that she had had prior to surgery, but was still having left-sided numbness. She related that she had good days and bad days. This is the last time that Mrs. Fusiler saw Dr. Rivet.
Dr. Martinez saw Mrs. Fusiler for a follow-up visit on September 8. Mrs. Fu-siler reported that the past six weeks had been bad. She was fatigued with weakness in her lower extremities. Her whole left side had a numb, tingling sensation when she bent her head and neck forward. Dr. Martinez observed hyperflexia in her lower extremities. These symptoms concerned Dr. Martinez, so he decided that it was time to repeat some studies and ordered an MRI scan of the neck and lower back. Dr. Franklin treated Mrs. Fusiler on September 4 and also observed that her condition had worsened, noting that she had been doing well on July 25 when he had last seen her.
|aThe MRI revealed a mild disc herniation to the left at L5-S1. In the cervical spine she still had significant disease at C6-7 with spinal cord impingement and maybe even some focal atrophy of the spinal cord. A large ventral osteophyte at C6-7 was also present. Mrs. Fusiler told Dr. Martinez that she wanted a second surgical opinion because she did not like Dr. Rivet’s bedside manner. Therefore, Dr. Martinez referred her to another neurosurgeon, Dr. Stephen Goldware.
Dr. Goldware first saw Mrs. Fusiler on October 17, 1991. He explained that the MRI indicated that she was developing an early swan neck deformity. At that visit he noticed that Mrs. Fusiler had a spastic ataxic gait which was described as an unsteady gait because she was having trouble maintaining her balance. Dr. Goldware explained that this indicated spinal cord compression and he thought that she would need an anterior decompression and fusion. Not feeling comfortable with the complexity of the potentially required surgery, Dr. Goldware referred Mrs. Fusiler to Dr. George Sypert, a neurosurgeon in Florida.
Dr. Sypert examined Mrs. Fusiler on October 24. After a myelogram, Dr. Sy-pert diagnosed Mrs. Fusiler with cervical myelopathy secondary to cervical spondy-losis, compression of the spinal cord from the front of the neck with basically stretching of the spinal cord due to the flexion deformity over these masses which was causing compression from the front side of the spinal cord, and the possibility of a little traumatic myelopathy or spinal cord problem related to the previous surgery.
On October 25, using an anterior process, Dr. Sypert removed the defects that were causing pressure on the spinal cord from C4 to C7. He also cracked the spine back open to correct the bent deformity and reconstructed the front of her spine with Rhone grafts. In December 1992, Dr. Sypert performed another surgery on a new herniated disk at C7-T1.
The Fusilers’ suit against Dr. Rivet alleged that he violated the standard of care in the performance of the surgery and in his post-surgical care. They specifically allege that he should have used an anterior approach and performed a fusion. The Fusilers also complain that Dr. Rivet failed to diagnose the post-surgical symptomalo-gy and take the necessary corrective measures.
The Fusilers and Dr. Rivet entered into a settlement agreement for less than $100,000 with the Fusilers reserving their right to proceed against the PCF. The PCF filed a motion for summary judgment arguing that there is no evidence that Dr. Rivet was at fault or caused any damages. After reviewing the depositions of the doctors and medical records, the trial court agreed and dismissed the Fusilers’ suit against the PCF with prejudice. The Fu-silers appealed.
SUMMARY JUDGMENT
We review the grant or denial of a motion for summary judgment under a de *1034 novo standard. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181, 99-2257 (La.2/29/00); 755 So.2d 226. Pursuant to Louisiana Code of Civil Procedure Article 966, the burden of proof is on the movant to prove that there is no genuine issue as to material fact and that it is entitled to judgment as a matter of law. With the amendments in 1996 to the summary judgment law, summary judgment procedure is now favored to secure the just, speedy, and inexpensive determination of every action. Article 966(A)(2).
In order to prove medical malpractice, a plaintiff must satisfy a three-prong test defined in La.R.S. 9:2794(A):
[fiA. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, ... within the involved medical speciality.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care or diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
We have reviewed the evidence in the record submitted by both parties. We agree with the trial court that there is no genuine issue of material fact that Dr. Rivet did not breach the standard of care in either the surgery he performed on Mrs. Fusiler or his care of her after the surgery.
On March 8, 1994, a medical review panel rendered an opinion. It specifically concluded that it is an individual doctor’s judgment whether to use an anterior or posterior approach and that it had no problem with the posterior approach used by Dr. Rivet. It further found that there was no evidence that Dr. Rivet removed excessive vertebral mass or that a fusion was required. A fusion was performed by Dr. Sypert because he performed an anterior diskectomy. They also found that Mrs. Fusiler did not return to Dr. Rivet, so he did not have the opportunity to correct any problems.
Prior to the surgery, Dr. Rivet had consulted with Dr. Martinez who agreed with the suggested surgery and the approach utilized by Dr. Rivet. Dr. Rivet explained that he decided to use the posterior approach because he wanted to work | fion all five involved levels and five levels are not done from the front because no doctor would do a five-level fusion. A fusion would not be required from a posterior approach. Dr. Rivet freed up the back side of the neck, so that the spinal cord could move forward and relieve some of the pain. Surgery from an anterior approach would require a greater removal of bone.
It was Dr. Sypert’s opinion that the initial surgery resulted in a kyphotic deformity, which is a forward flexion deformity. Dr. Sypert stated that he was not rendering an opinion on the care rendered by Dr. Rivet. However, Dr. Sypert did comment that even though Mrs. Fusiler was made worse after the initial surgery, there was no deviation from the standard of care. He testified that the development of this type of deformity is an inherent risk of that kind of surgery. Furthermore, he stated that he has performed this type of surgery, and if his patients develop this condition, he also has to reconstruct it *1035 from the front side as he had to do in Mrs. Fusiler’s case.
The last time that Mrs. Fusilier saw Dr. Rivet was August 19. It was not until September 3 that Dr. Martinez suspected that something was amiss when he first noticed the spastic ataxic gait which prompted him to obtain further studies. Dr. Franklin did not notice an irregular gait pattern until the office visit on September 18. As explained by Dr. Martinez, Mrs. Fusiler did not have any symptomatic complaints or sensory findings that fit into any particular pattern until he saw her September 8. Dr. Martinez testified that Mrs. Fusiler-was experiencing a dynamic process that was changing over time. Dr. Rivet’s examination on August 19 probably would not have revealed the same findings as those he found on September 3.
Dr. Sypert testified that Mrs. Fusiler had very serious complaints following her first surgery. However, he relied on the history given by Mrs. Fusiler and had not previewed any of the other medical records. He stated that Mrs. Fusiler told him that after her surgery she awoke with difficulty walking, clumsiness of the left arm and legs, and numbness below her neck. She also complained that when she bent her neck forward she would develop an electrical sensation that ran down the left side of her body into her leg.
We know from the above evidence that these complaints were not initially all present and developed over time, with the most significant complaints not present until early September. Both Drs. Martinez and Franklin had also been following Mrs. Fu-siler’s progress after her surgery and did not note any problems that would lead them to believe that additional testing was required until September 1991. By this time, Mrs. Fusiler would not return to see Dr. Rivet. He last saw her on August 19, and her complaints at that time were what the doctors testified were typical complaints following this type of surgery.
We find that summary judgment was appropriate in this case. There is no evidence that the surgery performed by Dr. Rivet deviated from an acceptable standard of care under similar circumstances. We also find that there was no evidence that his care of Mrs. Fusiler after the surgery was not within the acceptable standard of care.
The judgment of the trial court is affirmed. Costs of this appeal are assessed to Brenda and Earl Fusiler.
AFFIRMED.